{¶ 1} Plaintiff-appellant, Shelly Ridley, appeals from the judgment of the Common Pleas Court, rendered after a jury verdict, finding in favor of defendant-appellee, Federal Express Corporation ("Federal Express"), on her claim for sexual harassment.
 {¶ 2} In March 2002, Ridley filed suit against Federal Express and two of its employees, alleging sexual harassment in violation of R.C. 4112.02, common law hostile environment sexual harassment, intentional infliction of emotional distress, defamation and assault, and seeking compensatory and punitive damages. The trial court subsequently dismissed several claims pursuant to the defendants' motions for summary judgment; prior to trial, Ridley dismissed her claims against Harvey and Botkins. Hence, the only claims remaining for trial were Ridley's claims against Federal Express for sexual harassment in violation of R.C. 4112.02 and compensatory and punitive damages.
 {¶ 3} Ridley was hired by Federal Express in July 1995 as a cargo handler at its Cleveland Hopkins Airport Ramp facility. She was promoted to team leader in 1997. James Harvey supervised Ridley through 1999; from December 1999 to December 2001, Ridley's supervisor was Gregory Sistrunk. In January 2002, Dave Paszko became Ridley's manager. The most senior management official for Federal Express at the Cleveland airport facility is Ron Mifflin, Senior Manager.
 {¶ 4} Ridley testified at trial that beginning in August 2001, she was subjected to daily harassment by Shawn Botkins, a co-worker of hers. According to Ridley, Botkins made comments such as, "you're not bad for a married girl," "I'd fuck you, bitch," and, with reference to a female co-worker, "I bet she could lick you until you quiver." In addition, Botkins would grab his crotch and then tell Ridley, "I know you want this, bitch." Ridley testified that Botkins continued making these comments even though she repeatedly told him to stop.
 {¶ 5} Ridley testified further that James Harvey, Botkins' supervisor, overheard the comments but would just laugh at Botkins. Ridley testified further that she complained to Harvey many times about Botkins' language, but Harvey merely told her that Botkins "has a tendency to be obnoxious." Ridley testified that on one occasion, after she complained to Harvey about Botkins' language, Harvey asked her for a key to a truck and said, "Give me the key bitch," and then laughed and said, "Isn't that what Shawn would say?" Ridley testified that, on another occasion, Harvey heard her scream "get away from me" to Botkins, but, rather than take appropriate disciplinary action, he merely separated her and Botkins for a short time.
 {¶ 6} On cross-examination, however, Ridley admitted that she never formally complained about Botkins to Harvey until February 12, 2002, although she told him prior to that time that she was "tired" of Botkins' language and that he and the other drivers only encouraged him by laughing at him. In addition, she admitted that she never told Harvey about Botkins' obscene gestures and that neither Harvey nor any other manager was present when Botkins called her a bitch.
 {¶ 7} In early February 2002, Ridley's sister, Kim Schrippa, was training to become a tractor trailer driver for Federal Express. Botkins told Ridley that her sister would be fine in the job, if she let him "get in her pants." Ridley testified that she met with Harvey on February 12 and complained to him about Botkins' comment. When Harvey asked Ridley whether she wanted Botkins to lose his job, she told him that she wanted Harvey to "write Shawn up" so that he could be terminated if the behavior did not stop.
 {¶ 8} Ridley testified that the day after she met with Harvey, Botkins told her that he knew about her meeting with Harvey and that she better not "fuck with [him]." Ridley then told Paszko, her manager, about Botkins' threat. Paszko sent Ridley home because she was so upset. Ridley testified that when she returned to work on February 15, other drivers called her a "whore" or "bitch." One of the drivers, James Markey, walked up to her, put his hands in front of her chest, and asked Ridley if he could "squeeze those."
 {¶ 9} Ridley testified that when she returned to work on February 15, Paszko met with her to ask her how things were going. When she told him that nothing had changed, he gave her an EEO packet and suggested that she complete it.
 {¶ 10} Ridley's sister, Kim Schrippa, testified that in early February, when Ridley told her about Botkins' comments, she told her manager, Jamie Sandercock, that she would only take the position if he could guarantee that Botkins would not be her trainer.
 {¶ 11} On Saturday, February 9, Sandercock sent an email to Ron Mifflin and James Harvey concerning Schrippa's conversation with him. Mifflin testified that upon receipt of the e-mail from Sandercock, he sent an email to Harvey requesting that he meet with Botkins to make him aware that his conduct was unacceptable. Harvey testified that he read the email on Monday, February 11, and met with Botkins later that day. According to Harvey, he reviewed the acceptable conduct and sexual harassment policies with Botkins, who denied that he had engaged in any inappropriate behavior. Harvey told Botkins that he had to stop any inappropriate behavior and gave him copies of the polices.
 {¶ 12} Two days later, Harvey received an email from Sandercock, in which Sandercock stated that Ridley's sister had told him that Ridley was "getting some crap" from Botkins for bringing the matter to Sandercock's attention. Harvey testified that he met with Ridley later that morning and told her that her sister had made allegations about Botkins' inappropriate behavior. Harvey testified that he told Ridley she should report the incident so Federal Express could conduct an internal investigation into the matter. According to Harvey, Ridley stated that she did not want to get involved.
 {¶ 13} Dave Paszko, Ridley's manager at the time, testified that on Friday, February 15, 2002, Ridley asked him if she could meet with him. During the meeting, Ridley told Paszko about Botkins' comments regarding her sister and, further, that she felt that Harvey had betrayed her confidence because Botkins had threatened her that she should not "mess with him." Ridley also told Paszko about an earlier incident involving Botkins' inappropriate comments to her and suggested that Harvey might have heard the comments because he was in the same room. Paszko testified that Ridley made no mention during this meeting, however, about telling Harvey about any other incidents involving Botkins nor did she complain to him that Harvey had not done anything in response to her complaints about Botkins' behavior. Paszko also testified that Ridley did not complain about any inappropriate comments allegedly made to her by Harvey.
 {¶ 14} Paszko told Ridley that he needed to contact Rebecca Bell, the department's Human Resources representative, to determine how to proceed. He also told her that he would get the materials together for her to proceed with an EEO complaint if she wanted to pursue the matter. Later that day, Paszko again met with Ridley and, pursuant to Bell's instructions, gave her an EEO packet to complete and explained the steps she needed to take to pursue the complaint. Paszko told Ridley that he was leaving town and would not be back at work until the following Friday, but instructed her to send the completed EEO packet to Bell. Paszko gave Ridley a Federal Express air bill on which he had filled in Bell's address.
 {¶ 15} Paszko testified that upon returning to work on February 22, he asked Ridley if she had sent the EEO packet to Bell. Ridley told him that she had not done so because she was unsure if she wanted to proceed, but would bring it in the next day. When Ridley brought the packet in the next day, he sent it to Bell.
 {¶ 16} Bell testified that she received the packet on February 25 and, pursuant to policy, forwarded the packet to Federal Express' Employee Relations Department in Memphis, Tennessee. According to Bell, Paszko had called her on February 12, in response to a conversation with Jamie Sandercock regarding Botkins' comments to Ridley about her sister. Bell testified that she told Paszko to get an EEO packet to Ridley immediately. Bell testified further that she telephoned Ridley on February 13 to discuss what Paszko had told her. According to Bell, Ridley did not mention any other harassment by Botkins; she told Bell only about Botkins' comments to her about her sister. Bell testified that she also contacted Ridley's sister, who told Bell that she did not want to get involved.
 {¶ 17} Upon receipt of Ridley's EEO packet, Bell contacted Ronald Mifflin to advise him that she had received the packet. Mifflin testified that he met with Ridley on February 25 and told her that the EEO packet had been received and an investigation would proceed. He also gave Ridley his home and cell telephone numbers and advised her that she should call him if she had a question or needed help with anything. According to Mifflin, Ridley never contacted him after the meeting.
 {¶ 18} Mifflin and Harvey met with Botkins the next day. They advised him that an EEO investigation would proceed and informed him that he was not to discuss the matter with anyone other than the individuals conducting the investigation.
 {¶ 19} Mifflin also ordered Harvey to change Botkins' work schedule to minimize his contact with Ridley. Harvey testified that he made some minor changes to Botkins' schedule "either that week or over the next week" and made more extensive changes that were to take effect "a couple of weeks later." Botkins was terminated, however, before the more extensive changes took effect.
 {¶ 20} Harvey denied that Ridley ever complained to him about Botkins. He also denied that he ever witnessed an argument between them, saw Botkins grab his crotch, or make any sexually explicit comments to Ridley. He admitted, however, that he once heard Botkins use the term "lick" to Ridley and that, in hindsight, he should have done something about it. Finally, Harvey admitted that although he is obligated as a manager to offer an employee the EEO packet if the employee has a discrimination complaint, he did not offer Ridley the packet when she complained to him on February 12. On March 1, Bell received notification from Employee Relations that she was to proceed with an investigation into Ridley's complaint. On March 13, Bell sent a report summarizing her investigation and recommending that Botkins' employment be terminated to the Employee Relations Department. Botkins was terminated on March 21, 2002.
 FIRST ASSIGNMENT OF ERROR {¶ 21} In her first assignment of error, Ridley complains that the trial judge erred in refusing to disqualify Juror No. 2 for cause.
 {¶ 22} The following colloquy occurred during voir dire:
 {¶ 23} "THE COURT: Miss Jackson, you raised your hand when counsel brought up the subject of money. Would you explain, please, in more detail what your feelings are as would apply to your service on this jury?
 {¶ 24} "JUROR NO. 2: Well, without knowing exactly what the case involves, my husband owns his own business, and over the years there have been several incidents where employees have brought frivolous claims against his company. So I would say I may or may not be influenced by my own personal feelings.
 {¶ 25} "THE COURT: Did they involve sexual harassment or other things?
 {¶ 26} "JUROR NO. 2: That and other things, you know, unsubstantiated, but, you know, over the years there are things I hear at home, a lot of things that impact his business and/or family, personally.
 {¶ 27} "THE COURT: Suppose you listened to the evidence in this case, and as a result of the testimony you became convinced that plaintiff had a right to file suit and has been a victim of the circumstances that she described to you and she was entitled to compensation. Would you have a problem granting an award because of what you went through in your own family?
 {¶ 28} "JUROR NO. 2: I'm not sure.
 {¶ 29} "THE COURT: You would try to keep an open mind?
 {¶ 30} "JUROR NO. 2: I'm not sure.
 {¶ 31} "THE COURT: You are not sure; is that right?
 {¶ 32} "JUROR NO. 2: I mean, from my own personal experience, being, you know a family business, those things are more personal to me. It's not somebody else's money. So I don't know.
 {¶ 33} "THE COURT: I, of course, had a number of cases involving, let's say, medical, where a doctor has been accused of negligence. A jury may say I don't think you should sue your doctor, but after hearing the evidence, and in some cases they will find that the case had merit and they are able to participate in a verdict.
 {¶ 34} "What I'm trying to find out is if you feel that you are able to reach a conclusion with your fellow jurors or whether or not you feel that you shouldn't be involved at all?
 {¶ 35} "JUROR NO. 2: I would try to be fair. I do have that. I come from a background where I'm sure it somewhat might influence me."
 {¶ 36} Ridley contends that this colloquy demonstrated that Juror No. 2 could not be fair and impartial. When the trial court denied her motion to remove Juror No. 2 for cause, she was forced to use a peremptory challenge to remove Juror No. 2 and, therefore, could not remove Juror No. 14 from the jury, who indicated that she was concerned that the employer, rather than "the individual who was doing it," was the defendant. Ridley asserts that the trial court's failure to disqualify Juror No. 2 for cause denied her right to a fair and impartial jury. We disagree.
 {¶ 37} The decision to disqualify a juror for bias is a discretionary function of the trial court. Berk v. Matthews
(1990), 53 Ohio St.3d 161, 168-169. Where a trial court is vested with such authority, reversal on appeal is justified only if its exercise of that authority constitutes an abuse of discretion.Hicks v. Westinghouse Mtls. Co. (Sept. 27, 1995), Hamilton App. No. C-940094, citing AAAA Enterprises, Inc. v. River PlaceCommunity Urban Redevelopment Corp. (1990), 50 Ohio St.3d 157,161; Kunkle v. Kunkle (1990), 51 Ohio St.3d 64, 67.
 {¶ 38} Here, Juror Number 2 never stated that she could not be fair and impartial and, in fact, stated that she "would try to be fair." Thus, we find no abuse of discretion in the trial court's decision to deny Ridley's motion to disqualify Juror Number 2 for cause. Moreover, we note that Juror Number 14, who Ridley contends she would have removed with her final peremptory challenge if she had not been forced to use a peremptory challenge to remove Juror Number 2, also stated that she "would try to be fair and listen to the facts" in deciding the case. Thus, we find no merit to Ridley's contention that the trial court's failure to disqualify Juror Number 2 denied her a fair and impartial jury.
 {¶ 39} Appellant's first assignment of error is overruled.
 SECOND ASSIGNMENT OF ERROR {¶ 40} In her second assignment of error, Ridley contends that the cumulative effect of the trial court's rulings and attitude toward her at trial deprived her of her right to receive a fair trial. Accordingly, she contends that the trial court erred in denying her motion for a mistrial.
 {¶ 41} Recently, in Hampton v. St. Michael Hosp., Cuyahoga App. No. 81009, 2003-Ohio-1828, this court explained the standard for review of a trial court's order regarding such a motion in a civil case. We stated,
 {¶ 42} "`[W]hile the granting or denying of a mistrial rests within the sound discretion of the trial court, * * * this rule of law appears to apply almost exclusively to criminal cases. Although several courts have proclaimed that the misconduct of counsel, because of its influence on the jury, may be grounds for a mistrial in a civil action, * * * a review of the Ohio Civil Rules fails to offer any authority which empowers a court to grant a mistrial in a civil case.' Judges have treated a motion for a mistrial in civil cases as a motion for a new trial under Civ.R. 59, and we do so here." Id., quoting Settles v. OverpeckTrucking Co. (Aug. 26, 1991), Butler App. No. CA09-05-094; and citing Wills v. Boyd (Nov. 20, 1980), Montgomery App. No. 6755.
 {¶ 43} Ridley first contends that the trial judge treated witnesses for the parties inconsistently by allowing Rebecca Bell to give long-winded answers during cross-examination, while limiting Ridley to short answers during her cross-examination. She also takes exception that the trial court allowed Ron Mifflin to explain the circumstances of the sexual harassment charge against him by a Federal Express employee, even though her counsel had not asked for any such explanation.
 {¶ 44} Evid.R. 611 provides that the trial court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to 1) make the interrogation and presentation effective for the ascertainment of the truth, 2) avoid needless consumption of time, and 3) protect witnesses from harassment or undue embarrassment."
 {¶ 45} A trial judge has broad discretion under this rule to control the flow of a trial and a reviewing court may not substitute its judgment for that of the trial court absent an abuse of discretion. State v. Prokos (1993), 91 Ohio App.3d 39,44; Sowers v. Middletown Hosp. (1993), 89 Ohio App.3d 572, 588.
 {¶ 46} Our review of the record indicates the trial court did not treat witnesses for the parties inconsistently nor abuse its discretion in controlling their cross-examination. Although Ridley complains that Bell was allowed to give long answers, while her responses were limited by the trial judge, the record reflects that the trial court on at least three occasions instructed Bell to keep her answers concise and to answer the question being asked. On another occasion, the trial judge told Bell that her answer was too long. He finally admonished her by telling her not to make speeches.
 {¶ 47} We likewise find no abuse of discretion with respect to Mifflin's testimony regarding the circumstances of the sexual harassment charge against him. The trial judge correctly noted that Ridley's counsel "opened the door" to such testimony by asking Mifflin whether a complaint had ever been filed against him and whether he was suspended or disciplined in response to the charge. Contrary to Ridley's argument, Mifflin did not "offer a five-minute dissertation on the evils of meritless sexual harassment claims." Rather, he gave the details of the charge against him, described the EEO investigation by Federal Express and summarized its ultimate conclusion that the charge did not have merit.
 {¶ 48} Ridley also complains that the trial judge showed his disapproval of her case when, in response to a question asked by her counsel, he responded, "Oh, come on," in front of the jury. Even if the response was inappropriate, our review of the record indicates that the court's comment was unrelated to the merits of Ridley's case. Moreover, the record reflects that the trial judge admonished defense counsel in exactly the same way when defense counsel persisted in asking repetitive questions.
 {¶ 49} "A trial judge is presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity." FrankNovak Sons, Inc. v. Brantley (Mar. 29, 2001), Cuyahoga App. No. 77823, quoting Corradi v. Emmco Corp. (Feb. 15, 1996), Cuyahoga App. No. 67407. Even assuming the trial court's comment was inappropriate, there is no evidence in the record that the trial judge attempted to impugn the integrity of Ridley's counsel or influence the jury. Therefore, this single comment was not prejudicial to Ridley.
 {¶ 50} Finally, Ridley contends that appellee's violation of the trial court's order granting her motion in limine to prevent the introduction of any evidence regarding her past marital history, including spousal abuse, requires us to overturn the trial court's denial of her motion for a new trial. Ridley objects to the following exchange during her cross-examination:
 {¶ 51} "MR. DOUGLAS: Do you recall telling Miss Rapisarda [Ridley's therapist] that your children were concerned about your husband coming home?
 {¶ 52} "RIDLEY: At the time we had that problem, yes.
 {¶ 53} "MR. DOUGLAS: Do you recall telling her during one of your counseling sessions that your children were concerned about your husband coming home?
 {¶ 54} "RIDLEY: I remember discussing it with her, but I don't remember the details of what I said.
 {¶ 55} "MR. DOUGLAS: Your husband was in jail at the time?
 {¶ 56} "MR. LICATA: Objection, your Honor.
 {¶ 57} "THE COURT: Overruled. I mean, sustained."
 {¶ 58} Ridley contends that even though the trial judge sustained her counsel's objection, the damage was already done and the jury heard irrelevant and inadmissable evidence of her prior marital problems, in direct contravention of the trial court's order granting her motion in limine.
 {¶ 59} Federal Express asserts that its questions were proper and moreover, that Ridley waived her right to appeal this issue because what "appellant apparently fails to understand" is that an order granting or denying a motion in limine is a tentative, preliminary ruling about an evidentiary issue that has not yet been presented in its full context and her counsel did not timely object to the questions at trial.
 {¶ 60} What Federal Express apparently "fails to understand," however, is that "the function of the motion as a precautionary instruction is to avoid error, prejudice, and a possible mistrial by prohibiting opposing counsel from raising or making reference to an evidentiary issue until the trial court is better able to rule upon its admissibility outside the presence of a jury once the trial has commenced." State v. Grubb (1986),28 Ohio St.3d 199, 201. (Emphasis added.) Thus, "at trial, it is incumbent upon a [party] who has been temporarily restricted from introducing evidence by virtue of a motion in limine, to seek the introduction of the evidence by proffer or otherwise in order to enable the court to make a final determination as to its admissibility * * *." Id., at paragraph two of the syllabus. Thus, Federal Express, rather than Ridley, was the party required to make the proper timely objection at trial so that the trial court could consider the disputed evidence, outside the presence of the jury, in its actual context at trial.
 {¶ 61} Moreover, contrary to Federal Express' argument, the questions that Ridley objects to were, in fact, prohibited by the motion in limine. They were not simply questions about conversations Ridley had with her therapist; they were questions obviously designed to elicit information about Ridley's prior marital history, in clear violation of the trial court's order. Nevertheless, the few questions that counsel for Federal Express asked before the trial court sustained counsel's objection were not so prejudicial as to require a new trial.
 {¶ 62} Either singly or cumulatively, the errors that Ridley complains of did not deny her a fair trial. Accordingly, the trial court did not err in denying her motion for a new trial.
 {¶ 63} Appellant's second assignment of error is overruled.
 THIRD ASSIGNMENT OF ERROR {¶ 64} In her third assignment of error, Ridley contends that the jury verdict in favor of Federal Express is against the manifest weight of the evidence.
 {¶ 65} Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley ConstructionCo. (1978), 54 Ohio St.2d 279. Moreover, an appeals court should be guided by a presumption that the findings of the trier-of-fact were correct. Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80.
 {¶ 66} To establish a claim of hostile environment sexual harassment, a plaintiff must establish that: 1) the harassment was unwelcome; 2) the harassment was based on sex; 3) the harassing conduct was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment; and 4) that either a) the harassment was committed by a supervisor, or b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. Hampel v. Food IngredientsSpecialties, Inc. (2000), 89 Ohio St.3d 169.
 {¶ 67} Ridley contends that since Federal Express admitted at trial that it became aware of the sexual harassment on February 12, 2002, "the single simple issue before the trial court was whether the employer failed to take immediate and appropriate corrective action." She contends that Federal Express' actions in investigating the sexual harassment were not "immediate" because no one gave her an EEO packet until February 15, Dave Paszko did not send the packet to Bell until February 23, corporate headquarters did not acknowledge that it received the packet until March 1, Federal Express did not rearrange Botkins' work schedule to avoid contact with her as instructed by Mifflin, and Federal Express took no action to protect her until March 7, when it finally suspended Botkins, pending its investigation. She also contends that Federal Express did not take "appropriate" action to remedy the hostile work environment because she is still experiencing sexual harassment on a daily basis.
 {¶ 68} Other evidence at trial, however, indicated that once Botkins' conduct was brought to Federal Express' attention, the company took immediate and aggressive action. Paszko testified that although he gave Ridley the packet on February 15, she did not return it to him until February 23. He sent it to Bell the same day, who received it on February 25 and immediately forwarded it to corporate headquarters. Bell was notified on March 1 that she should proceed with an investigation and by March 13, she had completed her investigation and recommended that Botkins be terminated.
 {¶ 69} In addition, there was evidence that Harvey met with Botkins on February 11, before Ridley filed her EEO complaint, to advise him that his conduct was unacceptable. In addition, Harvey and Mifflin both met with Botkins on February 26, the day after Bell had advised Mifflin that she had received Ridley's EEO packet. Harvey also made some immediate changes in Botkins' schedule to keep him away from Ridley and, according to Ridley, volunteered to walk her to her car and stay late at work to insure that she and Botkins were never alone together. Thus, there was evidence presented to the jury that once it was notified by Ridley that Botkins was harassing her, Federal Express took immediate steps to protect her and conducted an immediate and thorough investigation of her allegations, ultimately concluding that Botkins violated acceptable conduct standards and terminating his employment.
 {¶ 70} With respect to Ridley's argument that Federal Express did not take "appropriate" action, because despite Botkins' termination, the hostile environment continued upon her return to work, we note that Ridley's email to Bell on April 11, 2002 complained that "* * it's bad enough that most of these drivers don't speak to me anymore to my face but they sure do behind my back." The standards for judging discrimination in the workplace, however, are "sufficiently demanding" to ensure that anti-discrimination legislation does not become a "general civility code." Faragher v. Boca Raton (1998), 524 U.S. 775,788. Ridley's email refers to an "ordinary tribulation of the workplace," Id., not such extreme conduct that it amounts to a change in the terms and conditions of employment. Moreover, other than this single email, sent more than a year prior to trial, Ridley produced no evidence at trial that the alleged hostile environment was, in fact, still continuing.
 {¶ 71} Appellant's third assignment of error is overruled.
 FOURTH ASSIGNMENT OF ERROR {¶ 72} In her fourth assignment of error, Ridley contends that the trial court erred in granting Federal Express' motion for summary judgment regarding her claim for intentional infliction of emotional distress.
 {¶ 73} Civ.R. 56(C) provides that summary judgment is appropriate when: 1) there is no genuine issue of material fact, 2) the moving party is entitled to judgment as a matter of law, and 3) after construing the evidence most favorably for the party against whom the motion is made, reasonable minds can reach only a conclusion that is adverse to the nonmoving party. Zivich v.Mentor Soccer Club, Inc. (1998), 82 Ohio St.3d 367, 369-370;Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327. We review the trial court's judgment de novo and use the same standard that the trial court applies under Civ.R. 56(C).Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105.
 {¶ 74} To recover on a claim for intentional infliction of emotional distress, a plaintiff must prove that: 1) the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; 3) the actor's actions were the proximate cause of the plaintiff's psychic injury; and 4) the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable person could be expected to endure it. Pyle v.Pyle (1983), 11 Ohio App.3d 31, paragraph two of the syllabus.
 {¶ 75} Liability for intentional infliction of emotional distress will only be found in the most extreme circumstances:
 {¶ 76} "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!'"Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369, 375.
 {¶ 77} We agree with the trial court that Ridley offered no evidence that Federal Express intended to cause her emotional distress or should have known that its actions would result in serious emotional distress to her. Even if Federal Express knew or should have known about Botkins' harassment prior to February 2002, when Ridley filed her EEO packet, Ridley produced no evidence that Federal Express did not discipline or investigate Botkins prior to that time in an intentional attempt to cause her emotional distress. Moreover, Ridley produced no evidence that Federal Express intended to cause her emotional distress, or should have known that it would cause her emotional distress, in the manner in which it conducted its investigation into Botkins' alleged harassment after Ridley finally complained about him to Dave Paszko in February 2002.
 {¶ 78} In addition, although we do not minimize the emotional distress incurred by Ridley as a result of Botkins' harassment, she produced no evidence in response to Federal Express' motion for summary judgment that her emotional distress was "serious." The Ohio Supreme Court has described "serious emotional distress" as "emotional injury which is both severe and debilitating * * * found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." Paugh v. Hanks (1983),6 Ohio St.3d 72, 78. Although Ridley met with a counselor eight times in 2002 after she filed her lawsuit, she required no medication to cope with anxiety, stress or depression. Moreover, Ridley continued her employment with Federal Express, with no change in her hours, wages or other terms of employment, both during and after the harassment. Ridley's continuing employment, without difficulty, indicates that her emotional distress was not severe and debilitating. See Garcia v. ANR Freight Sys., Inc.
(N.D.Ohio, 1996), 952 F. Supp. 351, 359-360.
 {¶ 79} Because Ridley failed to demonstrate genuine issues of material fact regarding each element of a claim for intentional infliction of emotional distress, the trial court properly granted summary judgment regarding this claim.
 {¶ 80} Appellant's fourth assignment of error is overruled.
 FIFTH ASSIGNMENT OF ERROR {¶ 81} In her fifth assignment of error, Ridley contends that the trial court erred in granting Federal Express' motion for a directed verdict regarding her punitive damages claim.
 {¶ 82} A motion for directed verdict must be granted if "the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." Civ.R. 50(A)(4); Nickell v. Gonzalez
(1985), 17 Ohio St.3d 136, 137. The court does not weigh the evidence or evaluate the credibility of the witnesses; rather, the issue is solely a question of law — did the plaintiff present sufficient material evidence at trial on a claim for relief to create a factual question for the jury? Olive v. Columbia/HCAHealthcare Corp. (Mar. 9, 2000), Cuyahoga App. Nos. 75249 and 76349, citing Malone v. Courtyard by Marriott (1996),74 Ohio St.3d 440, 445. Appellate review of a motion for a directed verdict is de novo. Id., citing Whitaker v. Kear (1997),123 Ohio App.3d 413, 422; Howell v. Dayton Power Light Co.
(1995), 102 Ohio App.3d 6, 13.
 {¶ 83} Ridley asserts that a punitive damages claim should automatically go the jury if there is enough evidence for a sexual harassment claim brought pursuant to R.C. 4112.02 to go to the jury because the level of proof required for each claim is the same. Therefore, she asserts, the trial court erred in allowing the jury to decide her sexual harassment claim, but not her claim for punitive damages. We disagree.
 {¶ 84} As the Ohio Supreme Court stated in Detling v.Chockley (1982), 70 Ohio St.2d 134:
 {¶ 85} "Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or `malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton."
 {¶ 86} Thus, "a plaintiff is not automatically entitled to an award of punitive damages upon proof of a violation of Ohio's anti-discrimination provisions. As noted by the Supreme Court inRice [v. CertainTeed Corp. (1999), 84 Ohio St.3d 417, 422], Ohio law provides that punitive damages may be awarded only upon a finding of actual malice. * * * `Actual malice, necessary for an award of punitive damages, is 1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or 2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" Toole v. Cook (1999), Franklin App. No. 98AP-486. See, also, Stepic v. Penton Media, Inc. (Dec. 14, 2000), Cuyahoga App. Nos. 77318 and 77737 ("R.C. 4112.99
authorizes an award of punitive damages in civil employment discrimination actions upon evidence of actual malice in civil actions brought pursuant to the statute.")
 {¶ 87} It is clear, therefore, that even assuming a case of sexual harassment has been established, a plaintiff is not entitled to recover punitive damages in the absence of any evidence of egregious conduct or malice on the part of the defendants.
 {¶ 88} Ridley also argues that the trial court erred in granting Federal Express' motion for a directed verdict on her punitive damages claim because it required that she prove actual malice by clear and convincing evidence. According to Ridley, the clear and convincing evidentiary standard for punitive damages set forth in R.C. 2315.21(C)(3) applies only to "private tort" actions and, because an employment discrimination case brought pursuant to R.C. Chapter 4112 is not a "private tort," the clear and convincing standard does not apply to such cases. We are not persuaded.
 {¶ 89} A "tort action" is defined as "a civil action for damages for injury or loss to person or property," and "does not include a civil action for damages for breach of contract or another agreement between persons." R.C. 2315.21(A)(1). Ridley's sexual harassment claim is a tort action because it is "a civil action for damages of injury or loss to person or property" and, therefore, the clear and convincing standard applicable to tort actions applies. Moreover, the only case cited by Ridley in support of her argument, Johnson v. Stackhouse Oldsmobile
(1971), 27 Ohio St.2d 140, was superceded by the General Assembly's enactment of Am. Sub. H.B. No. 1, effective January 5, 1988 (which enacted the clear and convincing standard for punitive damages via R.C. 2315.21(C)(3)). Finally, Ridley contends that even if the standard for proving punitive damages is clear and convincing evidence, she presented sufficient evidence of actual malice at trial to withstand Federal Express' motion for a directed verdict. Once again, we disagree.
 {¶ 90} Ridley failed to present evidence that any of Federal Express' agents acted with hatred, ill will or a spirit of revenge toward her or with a conscious disregard for her rights and safety. In short, she failed to present any evidence of actual malice. Accordingly, the trial court properly granted Federal Express' motion for a directed verdict regarding her punitive damages claim.
 {¶ 91} Appellant's fifth assignment of error is overruled.
 {¶ 92} The judgment is affirmed.
Judgment affirmed.
Blackmon, P.J., concurs.
 ANN DYKE, J., CONCURS IN JUDGMENT ONLY.
It is ordered that appellee recover of appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.